UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| In re:<br><br>Kristie Edna Bumstead,<br><br>Debtor. | CASE NO. 24-CV-5341-BHS<br><br>U.S.B.C. NO. 24-40245<br><br>ORDER |
| LPL Financial LLC,<br><br>Appellant,<br><br>v.<br><br>Kristie Edna Bumstead,<br><br>Appellee. | |

This MATTER is before the Court on Appellant LPL Financial LLC's appeal, Dkt. 10, of the bankruptcy court's Order, Dkt. 1 at 12, ruling that LPL does not have a security interest in post-bankruptcy petition payments owed to debtor Kristie Bumstead.

ORDER - 1

## I. BACKGROUND

Matthew Bumstead is Kristie Bumstead's spouse.[1] Dkt. 11 at 40. He is a licensed investment advisor and was previously employed at LPL as an independent securities broker. *Id.* at 44–45.

In 2019, Bumstead borrowed $2.35 million from LPL to build a securities practice on LPL's platform. *Id.* at 10. The term note required him to "transfer to LPL any and all securities or investment advisory accounts [he] maintain[ed] at other securities or investment advisory firms within thirty (30) days of execution." *Id.* at 11. He provided as collateral his "right, title or interest in . . . all non-qualified brokerage and investment advisory accounts maintained at LPL," "all Accounts," and their "Proceeds and products." *Id.* at 11. LPL perfected its security interest with the Washington State Department of Licensing in "all of [Bumstead's] rights, title and interest to all [his] assets . . ., whether now owned or hereinafter acquired, wherever located, and all proceeds . . . thereof." *Id.* at 291–94.

In 2022, LPL terminated Bumstead and he defaulted on the loan, with approximately $2.34 million in principal outstanding. Dkt. 10 at 7; Dkt. 12 at 10. LPL initiated Financial Industry Regulatory Authority (FINRA) arbitration against Bumstead

---

[1] While Kristie Bumstead is the debtor for purposes of the bankruptcy petition, the bankruptcy estate comprises "[a]ll interests of the debtor and the debtor's spouse in community property." 11 U.S.C. § 541(a)(2); *In re Homan*, 112 B.R. 356, 359 (9th Cir. 1989). Because Matthew Bumstead's investment advisory assets are at issue here, the Court will refer to him as "Bumstead" in this Order.

to recover its money. Dkt. 10 at 7. Kristie Bumstead filed for Chapter 11 bankruptcy,[2] and the FINRA arbitration was indefinitely stayed. Dkt. 11 at 110.

Meanwhile, in 2023, Bumstead began working as an independent contractor at another financial services firm, SB Advisory, where he remains employed. *Id.* at 92, 101, 262. Most of his clients followed him from LPL to the new firm. *Id.* at 52. Only 5 of his current 203 managed accounts are associated with new clients. *Id.* at 75, 78. Bumstead charges his clients a 1.1% fee. *Id.* at 54–55. A third-party financial custodian holds the client funds and distributes the fees to SB Advisory. *Id.* at 67–68. SB Advisory keeps a portion as payment for its trading platform software, and the rest is Bumstead's compensation. *Id.* at 54–55.

When Kristie filed for bankruptcy, the Bumsteads had a balance of $1,230.61 across all their bank accounts and Bumstead was owed $7,226.18 in SB Advisory client fees. *Id.* at 53, 231. Accordingly, LPL had a secured lien on $8,456.79 in cash. *Id.* at 55.

LPL argued in the bankruptcy court that it was also entitled to "ongoing advisory fees generated from Mr. Bumstead's prepetition investment advisory agreements" with SB Advisory clients because they were "proceeds of LPL's collateral." Dkt. 11 at 21. The court disagreed, ruling that the "fact that Bumstead signs the investment advisory agreement does not make it an account which the LPL security agreement applies to." Dkt. 7-1 at 54. It concluded the client fees were not proceeds of funds owed to Bumstead

---

[2] Bumstead provides financial services through Clarity Capital Management, a sole proprietorship he co-owns with Kristie. Dkt. 7-1 at 27. Kristie filed for Chapter 11 bankruptcy because they both qualify as a "small business debtor" under 11 U.S.C. § 1182(1). Dkt. 11 at 124.

ORDER - 3

pre-petition under the Bankruptcy Code, 11 U.S.C. § 552(b). *Id.* at 54–55. The Bankruptcy court held the total collateral was only $8,456.79, which LPL collected. *Id.* at 55.

LPL appealed to this Court. Dkt. 1. It maintains that it has a security interest in advisory fees generated from agreements executed before Kristie filed for bankruptcy. Dkt. 10 at 11. Bumstead responds that the SB Advisory client accounts are not LPL's collateral to begin with. Dkt. 12 at 12–13.

## II. DISCUSSION

On appeal, a bankruptcy court's factual findings are reviewed for clear error, and legal conclusions and mixed questions of law and fact are reviewed *de novo*. *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 867 (9th Cir. 2001).

**A.     Under 11 U.S.C. § 552(b)(1), a creditor's security interest may extend to post-petition proceeds in some instances.**

The Bankruptcy Code provides that generally, a bankruptcy filing cuts off security interests in property acquired by a debtor's estate after "the commencement of the case." 11 U.S.C. § 552(a). However, if a security agreement extends to property of the debtor acquired pre-bankruptcy and "to proceeds . . . of such property," then the security interest extends to those proceeds even if they are received after the bankruptcy petition's filing. 11 U.S.C. § 552(b); *In re Skagit Pacific Corp.*, 316 B.R. 330, 335 (9th Cir. BAP 2004). This means "a creditor's security interest only encompasses the cash collected on existing pre-petition accounts." *Id.* at 336. "Proceeds of post-petition accounts receivable do not fall within the § 552(b) proceeds exception." *Id.*

The purpose of § 552 is to "allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors." *In re Bering Trader*, 944 F.2d 500, 502 (9th Cir. 1991). § 552(b) is a "*narrow* exception to the general rule of 552(a)" and "balances . . . freeing the debtor of pre-petition obligations with a secured creditor's rights to maintain a bargained-for interest in certain items of collateral." *Id.*

Washington's Uniform Commercial Code (UCC)[3] defines an "account" as "a right to payment of a monetary obligation, whether or not earned by performance . . . for services rendered or to be rendered." RCW 62A.9A-102(a)(2)(A). Proceeds" means property "acquired upon the sale . . . or other disposition of collateral," "collected on, or distributed on account of, collateral," or "rights arising out of collateral," among others. RCW 62A.9A-102(a)(64)(A)-(C).

The Washington UCC conforms with § 552(b), providing that "notwithstanding sale . . . or other disposition" of collateral, a creditor's security interest continues in the collateral and "any identifiable proceeds." RCW 62A.9A-315(a). "Proceeds that are commingled with other property are identifiable proceeds . . . to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law." RCW 62A.9A-315(b)(2). The creditor must "provide documentation of its identifiable or traced proceeds" using an approved

---

[3] State law governs the "nature and extent of security interests." *Bering Trader*, 944 F.2d at 502. *See Jipping v. First Nat'l Bank*, 568 B.R. 321, 324 n.22 (D. Alaska 2017) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)) (state law governs interpretation of a security agreement to determine scope of a claimed security interest); *In re Days Cal. Riverside Ltd. P'ship*, 27 F.3d 374, 375–76 (9th Cir. 1994) (state law determines what constitutes proceeds from property secured before bankruptcy).

tracing methodology. *Skagit*, 316 B.R. at 338. The "self-serving testimony of a creditor is inadequate." *Id.* at 339.

In *Skagit*, the Ninth Circuit Bankruptcy Appellate Panel (BAP) confirmed that any claimed security interest in a post-bankruptcy petition account receivable must be "properly traced to . . . pre-petition collateral." *Id.* at 336–37. *Skagit* concerned commingled proceeds from the sale of pre-petition collateral with a post-petition account receivable created for a contract project that the debtor completed after filing for bankruptcy. *Id.* at 333, 340. The BAP held that revenue generated after filing for bankruptcy "solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest," and any "interest in, or connection to the right in the account receivable" needed to be traced back to the pre-petition collateral. *Id.* at 336. Because the creditor had failed to adequately identify the commingled proceeds "by a method of tracing permitted under law," the BAP rejected the claimed security interest in the post-petition account receivable. *Id.* at 340 (citing RCW 62A.9A-315(b)(2)).

More recently, in a different context, the BAP held that § 552(b)(1) applied to post-petition settlement proceeds. *In re Endresen*, 548 B.R. 258, 273–74 (9th Cir. BAP 2016). The debtors obtained a loan to purchase several rowhomes, granting the lender a security interest in all "miscellaneous proceeds" from "compensation, settlement, or proceeds . . . for damage" to the property." *Id.* at 261. After filing for bankruptcy, the debtors pursued civil litigation against the builder of the rowhomes for significant construction defects and ultimately settled. *Id.* at 262. The BAP concluded the settlement amount were "proceeds" of the lender's real property collateral under § 552(b)(1). *Id.* at

270. Even though the settlement amount was received post-petition, it was a "substitute for [the] realty collateral," "paid for the purpose of repairing damage to the real property collateral," the proceeds of which were covered by the security agreement. *Id.* at 273–74. The lender therefore had an extended security interest in the settlement proceeds. *Id.*

**B.    LPL has not adequately traced Bumstead's client fees back to its original collateral.**

LPL contends the SB Advisory client fees are proceeds because "they are derived from and arise out of" its pre-petition security interest in Bumstead's accounts. Dkt. 10 at 18–19. It argues the security agreement encumbers "the right to commissions or fees from broker and investment advisory accounts serviced by Mr. Bumstead, whether or not such accounts are held at LPL, because those fees are directly and indisputably traceable to the original collateral." *Id.* (citing U.C.C. § 9-102, cmt. 13d (Am. L. Inst. & Unif. L. Comm'n 2022)).

Bumstead responds that the SB Advisory client accounts are not Bumstead's accounts and therefore not LPL's collateral. Dkt. 12 at 12. He argues that even if the accounts were LPL's collateral, it cannot enforce its security interest because he does not have "rights in the collateral" until he "provides his investment advisory services to the clients." *Id.* (citing RCW 62A.9A-203(b)(2)). He further contends the fees are his post-petition wages generated solely from his labor and thus exempt from § 552(b). *Id.* at 15–16.

The security agreement between Bumstead and LPL listed Bumstead's "investment advisory accounts maintained at LPL," all his "Accounts," and their

ORDER - 7

proceeds as collateral. Dkt. 11 at 11. LPL's security interest in Bumstead's LPL advisory accounts ended when Bumstead stopped working there. By encumbering Bumstead's "accounts" generally, the agreement gave LPL a security interest in Bumstead's rights to monetary payment for any rendered services. *See* RCW 62A.9A-102(a)(2)(A). But that security interest was cut off as soon as Kristie filed for bankruptcy. *Skagit*, 316 B.R. at 336.

The post-petition client fees are not a "substitute" for the underlying collateral—Bumstead's accounts—as was the case in *Endresen*. Rather, the fees owed to Bumstead are much more like the *Skagit* debtor's post-petition account receivable. Bumstead earns the client fees as the result of his own labor, and it is of no consequence that the labor is produced as an independent contractor rather than as an employee.[4] To the extent that LPL has any interest in those fees because LPL clients followed Bumstead to SB Advisory, they are now commingled with Bumstead's post-petition earnings. LPL must therefore prove, by an approved tracing method, that "the money currently in [Bumstead's] account corresponds to its collateral." *Skagit*, 316 B.R. at 338. LPL has not done so. It merely points to Official UCC § 9-102, comment 13d to argue that the fees being first paid to SB Advisory does not invalidate its security interest. Dkt. 10 at 22–23.

---

[4] The debtor provides a persuasive policy argument that if money earned by the debtor were proceeds—not wages for labor—and therefore recoverable by the creditor, the debtor would have no incentive to work resulting in a nonviable Chapter 11 plan. *See* RCW 62A.9A-109(d)(3) (Washington's UCC does not apply to "[a]n assignment of a claim for wages, salary, or other compensation of an employee.").

1  Comment 13d indeed states there is "no requirement that property be 'received' by
2  the debtor for the property to qualify as proceeds." U.C.C. § 9-102, cmt. 13d (Am. L.
3  Inst. & Unif. L. Comm'n 2022). But it also requires the "property be traceable, directly or
4  indirectly, to the original collateral." *Id.* It does not obviate state law's requirement that
5  the creditor use methods approved by law to trace identifiable, commingled proceeds
6  back to collateral. The mere assertion that the client fees are "directly and indisputably
7  traceable to the original collateral" is not enough. Dkt. 10 at 19.

8  The bankruptcy court did not err in concluding that LPL's security interest does
9  not extend to post-petition client fees owed to Bumstead. The bankruptcy court's decision
10 is **AFFIRMED**.

11 **IT IS SO ORDERED.**

12 Dated this 9th day of May, 2025.

BENJAMIN H. SETTLE
United States District Judge